Good morning, your honors. May it please the court, Michael Lozo on behalf of Appellant League to Save Lake Tahoe. Joining me today at table is Richard Drury. We're here today to talk about a case that involves a key regulations designed to protect Lake Tahoe from pollution, which are the so-called land coverage limitations or restrictions. Lake Tahoe is suffering a death of a thousand cuts, the loss of clarity and pollution issues that are confronting the lake are from a multitude of pollution sources, thousands of parcels around the lake, each contributing a little bit of pollution, which adds up to a large problem. And controlling every source is important, and TRPA's regulations do just that. And the key tool identified by the agency long ago is to limit hard coverage, things like roads and buildings, from being built on the land in the lake's watershed. And the agency applies the coverage to small parcels and large parcels alike. And if you're going to apply it vigorously to small parcels, you also have to apply it vigorously to the larger landowners. And this appeal involves whether TRPA can make believe that a private driveway designed primarily to allow the residents of a 50-home development, primarily serving their need to get their cars from the adjacent road to their houses, is instead primarily an oversized bike path. And whether TRPA can remove the driveway's land coverage from the project's overall coverage to allow the developer to build a larger project, and we think in exceedance of the coverage restrictions. In order to remove the 23,000 square feet of land coverage of the project's private loop driveway from the project's total coverage, TRPA had to make a number of findings, and there's two findings that we'll be talking about today. One is TRPA, based on substantial evidence, could make a finding that the facility primarily serves the needs of persons other than those who are or will be residents or the owners themselves. And the other finding at issue this morning is whether TRPA could find that there is no feasible alternative that would reduce land coverage. I wanted to take a moment and get our bearings in terms of the project itself, and I'm looking at the excerpts of record, page 339, just a map. On that page you can see in red is the driveway we're talking about. It's a loop driveway. It's 22 feet wide. It has two entrances onto Lake Village Drive, which runs across the top. Houses are on both sides of the driveway from one entrance to the next. And then below that you see in green the bike paths that were also built on the interior of the parcel, one called LPF4, Linear Public Facility 4, which goes directly south from the driveway and then veers west towards Route 50. And then LPF5 is this other branch that goes down to Cale Park. The issue here is... You would agree that LPT3 is the only access from the homes to Lake Village Drive, right? Yes, that is the only way to drive the car. So if it's going to go forward, they have to have some form of access. Right. In terms of getting your car from Lake Village Drive to your house, you have to take the driveway. So to distill your argument, I guess maybe it's to its practical essence, are you suggesting that that access should be limited to 8 feet? One of the findings they had to make was whether there is any alternatives that would reduce the coverage. The League's position is that one alternative is you don't need two prongs to ride a bike and walk from Lake Village Drive to LPF4. They advocated for an alternative that would use the shorter prong, the western prong, and even if you use the whole width of it as an alternative, it would still be much smaller LPF coverage than the whole driveway. The League also noted that a person riding a bike or walking could easily do that on the side of the road, consistent with the bike plan for Tahoe, where if you had four feet on each side of the road, you could ride your bike from that entrance the shorter distance to LPF4. They also have an alternative or advocated an alternative that was simply continuing LPF4 directly up to Lake Village Drive, 8 feet wide, just like the other bike paths, which are all 8 feet wide. Both of those alternatives would be less LPF coverage. Both would mean they would have less coverage for the overall project. But in terms of practicality, the road would still be there, but it would count. It would count towards the coverage that would be limited for the project. Or the project would have to be redesigned entirely. Right. It would have to be redesigned. Essentially. It would have to be redesigned. It would have to be made smaller, whether that's removing some of the buildings or some other type of coverage. You know, we'll leave that to the applicants to figure out what they might want to do with that case. But right now they have too much coverage on the site consistent with the regs. So to get to the statutory interpretation or the interpretation questions, your argument, I gather, is that primarily means it's necessarily quantitative, and that the quantitative record is insufficient. Is that basically right? That's right. Primarily has to mean, primarily, predominantly serving. Use more. Excuse me, Your Honor. Use more by members of the public than by people on the property. That would certainly be one indication of whether it's primarily serving the needs. I'm asking you, is it the only ñ what other indication is there? What else would ñ what does primarily mean in your view? For me, I think primarily means we're predominantly serving a particular need. In this case, it's a driveway. All the features are designed as a driveway to get cars to these homes. But for the homes being built along the loop driveway, you wouldn't need that road at all. So that's the primarily ñ that's what primarily would mean to me. I don't think we're arguing that some portion of the driveway can't also serve, even primarily, a need to get bicyclists and pedestrians to the interior bike paths. The League has only argued that, in terms of the alternatives, the TRPA could not make a finding that A double entrance, very large, 22-feet-wide driveway is the alternative that would be the lowest amount of LPF coverage that would achieve your goal. All they have argued is that you can either pick the shorter prong, and that's the shorter, most direct prong, actually, from the road, and you can pick four feet on either side in order to get people there. You could also have built the path directly north. The district court held for these two alternatives, for the first one, which is the alternative that just using one prong, the district court said, well, that's not really an LPF alternative. That's a project alternative because, in the end, it will reduce the size of the project. It doesn't quite ñ I don't even know how to explain the rationale because, clearly, using one prong of a two-prong driveway as an alternative to LPF to using the entire drive, it's clearly an LPF alternative. And in terms of the statute itself, or the ordinance itself, it doesn't talk about a goal to reduce coverage just for the LPF. It actually is more general than that. It's that there's no feasible alternative that would reduce land coverage, whether it's for the LPF, which this does reduce it, or for the whole project, which it does ultimately reduce it in this case. The judge's rationale, I think, would basically take the alternatives finding right out of the code because most things that reduce LPF coverage will also reduce the size of whatever alternative project folks wanted to put in there. Is there any room under the scheme for taking into account other aspects in which the project, if built, will further the goals of the compact? In other words, if they can't do this, then maybe they won't dedicate the 10-acre wilderness area. Right. And is that relevant in determining the feasible alternative question? I don't believe so, Your Honor. And I think that was the motivation, certainly, of TRPA, that they saw other benefits from the project, whether it was the moderate-income housing, whether it was benefits to the stream environment zone. And the league doesn't deny that the project has some benefits. But in this case, the requirement and the findings are that it has to primarily serve the needs of others than the residents, and it has to also be furthering the use of the LPF itself, which in this case the only need that was really identified in the record is a need to get bicyclists and pedestrians from Lake Village Drive down to the other bike path, LPF 4. So, no, I don't think the problem that TRPA has is you can't use the coverage rules and you can't bend the coverage allowance in order to allow for a bigger project just because it has some other benefits that you'd like to see done. You have to comply with the ordinance as it's written, and the ordinance is quite restrictive, that it has to be primarily serving needs of others, and the entire Loop Driveway doesn't. The other alternative that was addressed, which is the direct path, the district court also erred on that alternative as well by claiming that that alternative was actually addressed in the EIS, which is simply not true as well. The EIS addresses an alternative, which was to add a 4-foot sidewalk to the entire northern side of the Loop Driveway, still considering the whole driveway a linear public facility plus 4 feet of sidewalk. So it was actually an alternative to increase the LPF coverage, which is, of course, directly contrary to the alternatives. They need to figure out whether they exist, which is alternatives that would reduce coverage, and it's obviously an entirely different project from a path extending directly north from LPF 4 to Lake Village Drive. So I just wanted to make sure I covered the alternatives findings. I think the court clearly erred on the primarily serves the needs of others. The briefs discuss a lot of evidence, which makes it clear in our minds that the real needs served by the driveway are to get people in their cars who own the residences or their guests to those houses, and the evidence that is cited by TRPA and CRPAN really boils down to a few conclusory sentences found in the EIS, for example, where it talks about potential users at page 439 of the excerpts. Another place in the EIS says it is anticipated that the LPFs would be used by substantial numbers of surrounding residents, workers, and visitors for transportation and recreation. That's at ER 356. But none of these statements are based on any evidence. They're conclusory statements, and they don't show whether any bicyclists or pedestrians would use the driveway or at what level as compared to the obvious high level of use by the residents themselves and their 475 car trips per day that are estimated by the EIS as well as their own. That sounds like an awful lot of driving for 50 houses. That's the number that's in the EIS, Your Honor, and I'm happy to defer to that. And the EIS does say in other places that, in fact, the proposed LPFs may not experience as much traffic as other bike trails in the Tahoe region. And at excerpts 422, the EIS actually says the amount of bicycle and pedestrian traffic is expected to be low. So the conclusory statements are not evidence that somehow residents riding their bikes or walking from various other neighborhoods in the area is going to predominate over the numerous cars and the residents themselves. How about emergency access? I realize that you dispute the factual record on that and whether it's necessary. Let's assume for the sake of argument that emergency access is necessary. Doesn't that take it out of the question of number of trips? I mean, you only need one trip a year to justify emergency access, right? I'm just speaking in theory. I understand your argument about why that was an add-on and so forth, so you don't need to repeat that. Even if there were some recognized need for emergency access, I don't think that that predominates over the daily use that we're talking about. So even if it was guaranteed that there was going to be some emergency once per year, that people might use the driveway once per year to evacuate adjacent neighborhoods, I still don't think that's the primary need. I'm staring at the picture with regard to that, and I don't understand that, because this road does not connect to Highway 50, right? That's right. It doesn't. So the only way it would be helpful to evacuate people, I guess there are two possible scenarios. One is that Lake Village Drive is barred between the two places where this road hits Lake Village Drive. Correct. But it still won't get you off Lake Village Drive. You still have to go in and out on Lake Village Drive. Right. You could just go back. And the only other possibility is that you use the little bike road, the 8-foot-wide bike road, to get in and out, which maybe you could do with an ambulance, but you couldn't do with a fire truck. That's right. And that's what they acknowledge. The scheme they came up with the day of the hearing, the night before. It doesn't really seem to me to have a whole lot to do with – it's not a way, an alternative way to get in and out from any road other than Lake Village Road. I think that's right, Your Honor. And it reflects what the EIS itself found on the same day that these decisions were made, where in the final environmental impact statement, and I'm quoting, with regard to emergency ingress and egress, it says, there is no evidence to suggest that the addition of 50 residential units would substantially impair ingress to or egress from the site. And they're talking about the other neighborhoods as well. And the comments that are currently held up as somehow showing some obvious need for whatever speculative emergency might happen, the response to those comments published in the final EIS was that they expressed some concerns there, but they didn't put any kind of sufficient evidence to warrant that. And they also indicate that any particular emergency situation would be speculative. This is what the final EIS tells us. And keeping in mind that the question isn't whether one can conceive of some emergency happening to occur right on this stretch of Lake Village Drive that would require some non-residents maybe to use the driveway, the question is whether that speculative event where there is no need for additional access, at least according to the final EIS, is now conceivably a primary need for the driveway, which it's clearly not.  It's not a statutory interpretation or interpretive question. There was a debate in the briefs, and I'm just wondering, it seems to me it doesn't matter, and that's what I'm trying to find out, about whether the alternatives provision has a separate minimization requirement. Doesn't the feasible alternatives sub-factor basically mimic the minimization requirement? In other words, why do we have to do that? Is that debate by the boards? I mean, you didn't even bring it up today. And that wasn't going to make a lot of sense. Because it doesn't seem to matter. It seems that the feasible alternative factor takes account of that. I do think it's a distinct duty within the code itself that says TRPA has a duty to minimize. Same thing as using any feasible alternative. In this case, it's the same thing in terms of if you look at either the one-prong alternative or the direct path alternative, those have to, you know, in terms of the, especially the one that would use the driveway that's proposed, one-prong, it's clearly feasible. I'm just saying, isn't it always the same thing? I'm not sure it is, Your Honor, or not. I think on this particular case, it has considerable overlap because the minimum necessary would be simply the shortest prong at a minimum. But, you know, it is a distinct sentence. Our interpretation is that TRPA has to pick the minimum from the get-go, and then you do your findings to make sure you've actually got it right. But I don't think it has, you know, I do think this case turns primarily on whether the alternatives finding is adequate, and then secondly whether the finding about the primary needs to be served was supported by any substantial evidence whatsoever. You're down to about 2.18. Do you want to reserve? I would like to reserve, Your Honor. Thank you. Good morning, Your Honor. Lou Feldman appearing on behalf of the Tahoe Regional Planning Agency. Are you going to split time? We are splitting time. Ten minutes is reserved. All right, great. Thank you, counsel. I'll move the microphone a little closer to you. Thank you. This is an unusual case from TRPA's perspective in that there is no environmental harm that has been identified that flows from the approval of this project. And, in fact, there is a social benefit that flows from the approval of this project. That may be true, and that's why it's sort of troubling. And I suppose you could change your rules, but insofar as the LPF regulation directly applies, I mean, I understand that it may be a net loss, but don't we have to enforce it anyway? Well, it is being enforced. The point of this is TRPA has water quality drainage standards. In this particular instance, the project is exceeding those standards. So the fact that we have 800,000 feet of site area, and what we're talking about at LPF-3, by the way, is about 16,500 feet or 2.1% of this total site area. The fact that that is eligible for a coverage transfer in a direct offset coverage system, the record has demonstrated that the environmental gain reducing nutrient loading of 4,000 pounds But I don't understand how that's helpful to the question of whether this meets the definition that's in your compact. Maybe you need to change it. Maybe you didn't write it right. But in terms of what you've got there, how does that help? Well, the code section itself provides for a linear public facility to be eligible for a transfer of coverage. It has to primarily serve people other than the people on the property. How does this primarily serve people? And in this particular instance, we have an adjacent 325-unit subdivision. We have 5,400 residences within one mile. Excuse me, 5,400 residents, 3,900 residences within one mile. And by connecting a unconnected bike trail system, the opportunity for over 5,000 people to recreate in this area certainly predominates the benefit that would be experienced by potentially 50 homeowners. So an eight-foot path would serve the same purpose, wouldn't it? In terms of the public purpose, not the private purpose. With respect to the limited function of cycling. However, there are much broader implications here, which I believe Your Honor raised earlier, which are emergency access. And as you look at- Well, you know, that's true, except that emergency vehicles can get in on an eight-foot path. Well, the heavier- I realize for, you know, it's, you can do it. I mean, I know people think fire trucks are wider than that, but a lot of them aren't. But as you examine Lake Village Drive Echo Drive is a 60-foot wide linear public facility roadway. All the roadways generally in the basin are linear public facilities. Those folks in the Kingsbury Middle School that are up there have an opportunity in the event of wildfire- But there's nobody at Kingsbury Middle School. Kingsbury Middle School is- It's closed. There is no school. There is a school. It happens to not be operating as a school today. But there is a Kingsbury Middle School located at the top of that drive. As you exit Lake Village Drive Echo Drive in the event of a wildland fire, you would access LPF 3 and then be able to exit onto Highway 50 through LPF 4. We had a very recent- Yeah. So, but you could also do that on an eight-foot path because you have to be on an eight-foot path on the end. Well, but you wouldn't be able to manage the flow of traffic from evacuation and access of fire vehicles as well. So there's no benefit. I'm not understanding. I mean, when I started the configuration last night, I became somewhat mystified because you cannot get from this road to Highway 50. So either you go back on Lake Village Drive or you go on the bike path. Or you go on LPF 4. Right, which is a bike path. But LPF- So therefore, it has to be a vehicle that can get on a bike path. Therefore, it's a vehicle. So therefore, if the whole thing was a bike path, it wouldn't matter. Well, unless the bottleneck was in the middle of Lake Village Drive. Right. So the alternative is that you're skipping the middle of Lake Village Drive. So you have a, you know, sort of unusual circumstance. The only thing that it would accomplish. But then you couldn't get onto Lake Village Drive anyway. So all you could do, so all it would accomplish is if there was an emergency on one end of Lake Village Drive and there was a barrier in the middle, you could get to the other end of Lake Village Drive. But if there was an emergency in the middle of Lake Village Drive, it wouldn't help you because you couldn't get on Lake Village Drive. Well, but it provides an opportunity for people to evacuate via LPF 3 to LPF 4 and have emergency vehicles accessed through Lake Village Drive. So you can avoid a conflict. Right. But you could do that with a bike path because ultimately you're going to be on a bike path. I guess the, I realize this may seem a little unworldly, but a lot of these environmental cases are. If you try to figure out what the public use is restricted to that, emergency access, bikes, pedestrians, it's hard to see how this 20-foot easement or the 20-foot LPF figures into it. I mean, if you're talking about an emergency like this, sure, I mean, you can deal with an 8-foot bike path. They can get out. They can get in. It may not be convenient, but you can do it. But it's also the totality of the circumstances. And I think Your Honors mentioned that you look at this in terms of the entire package of deliverables. And in this particular instance, it's a trail network. That network provides an opportunity to create a dedication of 10.7 acres to the county. It provides an opportunity for enhanced fire suppression. But what is the authority or the justification for doing it that way, as opposed to looking at what the LPF itself is primarily used for? Because that's what the rule says. What is the LPF primarily used for? The LPF network is primarily used to service a greater interest, which is Douglas County's interest in connecting its trail network. This is the catalyst to provide a series of LPFs and a series of public benefits. That's what the governing board ---- Kagan. And why isn't a feasible alternative then simply crediting the 8 feet but not the 20 feet? Because a linear public facility can serve more than pedestrians and bicycles, which this one does. And it's a shared burden. So there's nothing in the code that would require us for TRPA to say 8 feet is a de facto permissible width for a bike path, 20 feet is not. In order to induce the private property owner to dedicate their private lands to facilitate not only the trail network, but to facilitate the water quality benefits, there are tradeoffs. And in this instance, the tradeoffs benefit the environment. Right. No, I think we understand that, at least the argument. But that's not our task is to figure out what the greater good is here. If it were, it would be one thing. We're just trying to figure out how to enforce your code. Right. And the code says public has to predominate. And it's clearly the LPF3 is designed as a road for the residents. It has some beneficial effects to the public, but it's hard to see that it doesn't. In other words, I'm just go ahead, sorry. Well, I mean, the language doesn't say – if the language said the purpose is primarily to do something, that would be one thing. Because you could say, well, we're building it mainly for this purpose, but it may be that, you know, it's actually to be used on a daily basis more by other people. But that's not even what it says. It says it primarily serves people outside. So it seems to be a – or you could tell me why it isn't a quantitative measure that says who's using this more. The governing board determined that the provision of this segment connects disjointed bicycle segments. Okay. And it is the catalyst for connecting this entire trail network that not only takes people to Round Hill and areas to the north, but takes people to Kingsbury Grade and areas to the south. It is the same exact circumstance with the Kale Drive – Kale Community Park and gymnasium where we had a 20-foot access road that provided access to the park. And TRPA concluded that that access road was a linear public facility, made the same findings for that completely adjacent access road as it did with respect to LPF3. It was the connectivity factor that provided access to various points from Kingsbury Grade to the community center, to the Douglas County Administrative Center, just as this LPF network connects these various components. So it's the connectivity of a fragmented trail system, which could not occur in the absence of the dedication of these lands, which is why Douglas County entered into a development agreement with the developer so that these lands could be utilized for both public and private stormwater. Right. But the public facility – go ahead. All those things could be accomplished purely from a public point of view with an 8-foot bike path. True? Well, they certainly could be, but this code section provides a mechanism for a developer to over-deliver. To over-what? To over-deliver, to create more public benefit. That's the outcome of application of 20.3b4, to get more public benefit. But how are you getting more – I don't understand that. How are you getting more public benefit from a 20-foot path and the 8-foot path? Well, in the absence of LPF3, this developer could simply have an all-private gated community. So the agency is looking at how is it that we can maximize the public benefit. We have a code section that is applicable to roadways. This roadway provides the catalyst for the public benefit. The public benefits are substantial. Right. I think we understand. I'm exceeding my time here. We'll give her 10 minutes. Don't worry about that. I just want to – hold on just a second. We've got a few more questions. I guess the struggle I'm having is I take your point that holistically this is the way it has to work. But I have trouble squaring that with the language that's contained in these regulations because it says primarily and it says feasible. It looks to me as though there are feasible alternatives. The problem is it just means that the project won't get done. Isn't that true? It is true. But the compact helps us there because the compact defines feasible as a means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors, all of which demonstrate that in order for this project to be feasible, we have this tradeoff. So we're balancing. And at the end of the day, it seems to me the fact that we have a reduction of nutrient loading from 4,000 pounds to 56 pounds is a tremendous outcome for the environmental community and the community at large. Okay. Thank you. Thank you. I gather that – oh, go ahead. It's fine. That's all right. We can finish. All I was going to say is I'm hypothesizing a response to that because I noticed that you've said or one of you talked in your briefs about what Judge Jones says in the hearing, why are you doing this to the plaintiffs? And my surmise is that they're doing this because they're afraid that this is going to become a norm, i.e., that every developer who builds a development is going to claim that their road is a bike path. And the question is, what are you saying that would prevent that? Well, we understand that. But if you look at the record, you'll find that in the 20-some-odd years since the adoption of the 1987 regional plan, we have but one example of another project where this has occurred. So this isn't a typical scenario. And, in fact, generally speaking, the code prohibits subdivisions. The basin is substantially built out. So from the agency's perspective, this is hardly the kind of thing that is likely to have a dramatic going-forward impact and, in fact, is rather rare. Okay.  Thank you, Your Honor. And would you put 10 minutes on the clock so she gets her full 10 minutes? Thank you, Your Honor. Hold on just a second until we get up there. There you go. May it please the Court. My name is Tina Thomas. I'm here today on behalf of the real parties in interest. And I just wanted to start by what's a definition of a shared roadway. I think that that's at the heart of this issue. A shared roadway is a bike path number three. It's a situation where you have multimodal use of a road by cars and bikes and by pedestrians. There may be wheelchairs. There may be other uses. It's used when you can't have a Class I or a Class II facility, meaning that you can't physically separate the bikes from the road and you can't stripe them away because there isn't sufficient, you know, width to have a stripe or to have them separate. So what's the Class III category or the shared bikeway, shared pathway approach? That is when you have a 20-foot wide road, you count the entire width of that road as the bikeway because it's a low-volume road. It's a low-speed road.  But it's signed as a bike path for a couple of reasons, to make sure that bikes know which direction they're going in and that they're on a safe path. But it's also signed so that the drivers know that they are sharing the road with bikes, pedestrians, and others. So you have Class I facilities, which are completely separate, Class II facilities that stripe away a distance between the two, and Class III, where you count the entire width of the road so that you have this maneuverability in a low-speed, low-volume area, and that's precisely what LPF III is. So there's categories of roadways and bikeways. Where is all this? That is in – it's contained in two locations. One in the Bikeway Master Plan for Lake Tahoe talks about it very clearly, and I think it's in the – it's the League's excerpt at page 516, 17, and 18. And so there's excerpts from the bike plan that talk about using the entire width of the roadway and signing it accordingly, and it explains why it's used when you don't have the ability to have a wider road to either, you know, separate them physically or by striping. It's also in the manual for the Association of State Highway and Transportation Officials, the AASHTO manual. It's in the record. Can you explain to me in what sense is this road going to primarily serve people other than the people who are using it to get to their houses? Very simply, it's going to be used by bicyclists and pedestrians coming from other locations, and I think that there is a lot of evidence in the record to show that. Well, there's almost none. I mean, what is there? Well, I believe that there's quite a bit of evidence, and we start with the notion that there's 5,400 residents in the area who will be using that particular bike path. Not all of them, but certainly some of them. You can ascertain, you can draw that legal inference that people are going to be using those bike paths. I think a very important piece of evidence in this record is the agreement that is entered into by Douglas County and the applicant to dedicate the LPFs to Douglas County for purposes of a bike path and a pedestrian path, and I think that that's very important. They say in there that this is a clear and substantial public benefit. They say in there that it's necessary to connect different parts of the county to other parts of the county. They say that it's important to get people off of Highway 50 where there have been fatalities so that they can have a safe bike path. So I think that the development agreement is very, very important. Four senior staff members of Douglas County both testified and submitted letters about how important it was to, again, provide that connectivity. They described it as the missing link. They said we have this fragmented bike path. But that goes back to what I was saying before. I mean, is this requirement in the regulation a quantitative requirement that most of the use is going to be by other – by people who don't live there? Is that how you read it or not? I do not read it as a quantitative requirement. Why not? Because I think that you can logically infer by the density surrounding the property that a number of people are going to be using. That's not what I asked you. So let me see if I can – maybe I'm not understanding the question, because I don't think that the code uses the word quantitative. Well, it says primarily. It does say primarily. It primarily serves. Primarily. It doesn't say the primary purpose. It says it primarily serves. So how would you read that as not – what does primarily mean if it isn't quantitative? I think that you don't have to do an actual head count. I think that they can infer from the evidence that's in the record that this is going to be used by a number of people. And, again, I think that the evidence is – If 25 people a day used it as a bike path, that would be okay? With 25 bike trips and 475 road trips? Well, again, I think, you know, if you look at the numbers that are in the record, you can assume that a number of people are going to be using this bike path. For example, the county – What's the number? The number is greater than the 425 that's in the record for the EIS because clearly if there's 5,400 residents in the area, I think the more than 425 people are going to be using it. If 300,000 to 400,000 people use Kale Park annually, which is immediately adjacent to the project, then I think you can infer from the record that more than 425 people will be using that bike path. But the people who use that park, if they want a bike, they can just go on LPF-5, LPF-4, go to Highway 50. There's no reason to go on this road. No. They can – we can connect them. They can come across down from Kale Park over, and then they can go back up to the middle school. There's just a lot of different connections here. Again, what Douglas County said is that this was an important connection for them to make. It was the missing link in their currently fragmented bike paths. So this was a very important connection. They say that about this particular road as opposed to the other two. They say it about the entire network of the LPFs that connect to the existing roadways – excuse me, existing bike paths that are in the county. But does LPF-3 connect to any existing bikeway? Yes. If you go up LPF-3 over to Lake Village Drive and you head – that would be east, you'd get to the bike path that goes up to the middle school and carries on up to Round Hill Road or the Round Hill area. So that's a very important connection. It gets people off of Highway 50 – critical. Right. I think at the end of the day we have to read primarily serves as the primary purpose. And maybe – is that a permissible construction? It's not the primary purpose. I think it is primarily serves. It's the number of people, I believe, that are going to be served. Well, I think in the real world, at least on this record, it would appear the primary use is going to be for vehicles. I disagree. I just disagree. I believe that the record is, again, shows that it's going to be used in its entirety by bikes and pedestrians. How do you get around the winter month problem then? There's a snow removal plan for LPF-3 and LPF-4, and I think that that's the primary, you know, ingress and egress emergency access purpose. It snows in Lake Tahoe. People know how to get around. So, you know, it's not going to be – It snows in my neck of the woods, too, and I notice that the bicycle use dramatically dips in the winter months, even if you do have plowing. Yes, and it does – it will dip, but there are other uses. There's snowshoeing. There's other things that go on. Again, this was a critical connection for Douglas County. A number of people testified with that to regard. During the EIS process, 99 letters were submitted that said, we need this – we want this access. They also submitted letters during the EIS process. And, by the way, the plaintiffs never – did not challenge the EIS, and the conclusions that are contained therein are final. And there is a – I guess what's influencing me is that on any road you go on anywhere – I mean, I live in Berkeley. There are lots of bicycle paths all over the place. There are lots of bicycles. Right. But the number of comparisons of roads and cars and bicycles is simply, you know, not comparable. And the bike paths are really important to the people who use them. But if you're looking at numbers, it's – you know, the fact that there are 5,000 people there doesn't mean there will be 5,000 uses of a bike path. Well, let's take your quantitative question and say if there's 50 houses and there's going to be, very conservatively, 425 trips a day, but there's 5,400 residents, if you use their 25 number in the EIR that says that 25 people – there are going to be 25 trips from those 50 houses for cars, if you extrapolate that out, then you get to that quantitative number of, you know, how many people are going to be using that road. So if – Twenty-five people in the area are going to use it as a bike pedestrian thing. Is that what you're saying? What the EIS says is that there's going to be 425 trips for – with cars. Okay. Yeah. And 25 with bicycles and pedestrians. Well, of course, people who live there are going to walk on the road, but that's a different question. And I guess I don't think it is a different question. I think that if you live in Round Hill and you work down in that government center, and you ride your bike to work, you're going to want to be able to be on a very safe road, and you're going to use that road. And if the number of 25 is for 50 homes, and if you have 5,400 homes, then you could extrapolate that there's going to be, you know, upwards of 2,000 trips. Did anybody extrapolate in this record? Did they extrapolate? I think that there are logical inferences that are drawn by TRPA and Douglas County that are very clear here. There is a population – it's an infill project in an urban core where people recreate with frequency. It's a tourist area. In fact, the number of tourists there during the summer are equal to the population of Douglas County. So this is an area that's very popular for recreation. It fulfills – this project fulfills the recreational and transportation goals of Douglas County and TRPA by connecting these bike paths. Very important, very critical. And it takes people – it reduces – it takes people out of their cars and reduces vehicle miles traveled. This is a clear goal of both TRPA and Douglas County. And I just – excuse me. And what about the feasible alternative issue? Yes. I wanted to turn to the reasonable alternative issue, because I think that there's some questions there. First, with regard to whether or not the plaintiffs exhausted their administrative remedies. These – these alternatives were not raised clearly or fairly in an – I read the record, and I thought it was pretty clear what they were saying. Then I – Why don't you just count the 8 feet? Why are you counting all 20 feet? Well, I think that the way – I don't know. Let me amend. I don't know if it was the same they, but somebody said it several times. Okay. The issue that was raised was at the hearing, the day of the hearing. What they submitted was a map from the EIS that said, here's the power line easement. Why don't you use that? Well, that's a very difficult question to answer. First of all, they don't – they have not submitted any evidence or any inkling that those kinds of alternatives would even be feasible. We're talking about an area that is environmentally and engineering, from an engineering perspective, has a lot of constraints. So if you're going to design a bikeway, a shared bikeway through that area, a shared pathway through that area, you have to take into account these very steep slopes. We know that it has, you know, a very significant drop. It's very steep. We have to take into account the cut and fill. You have to take into account the fact that there are conservation areas. In fact, their power line approach goes right through a conservation easement, goes right through class one capability soils, which are precisely the types of soils that we're trying to protect in the Tahoe region. So, in other words, it goes through very steep areas that would, if you cut through that, it would cause more sedimentation. So this is a very – and that's why the EIR concluded, we have looked at alternatives to the LPF network, and we have concluded that this is the only feasible LPF network because of all the constraints on the site. They did not challenge that conclusion in the EIR. That's what that concluded. And they did not – the plaintiffs, they did raise the issue about here's this map with the power line easement, but there's no discussion whatsoever about feasibility, and the obligation in the code is that they look at feasible alternatives. There is no evidence from the plaintiffs that any of the alternatives that they raised at the last minute were at all feasible. And so if you look at the analysis that's in the EIS, and you look at the conclusion that is drawn, and you look at the constraints that are on the site, and then you look at the casualness with which they present the alternative, it's very unclear what they're talking about in terms of, you know, how do you provide an alternative to this existing network that would reduce the coverability or the cover. It's just not clear at all. So we start with the notion that they have not exhausted their administrative remedies. We move to the notion that there's no evidence whatsoever that what they've proposed is even remotely feasible. And certainly the EIS, which again was not challenged, concludes that there are no alternatives that would reduce the impacts or reduce the coverage. Thank you, counsel. Thank you, Your Honors. Just quickly, the league agrees that the project should try to connect pedestrians and bicyclists to the interior pathways. So why isn't that sufficient? I mean, we're kind of parsing the nuances of these phrases, but we also have an obligation to be deferential. And if they say, all right, let's say, leaving aside quantitative analysis, let's say we have a greater need here that we're going to serve. And why isn't that sufficient to say that that's a public service, regardless of how many times a bicyclist goes down versus a car? Because the requirement is that the LPF itself primarily serve the needs of others, and it also has the alternative requirement where it has to be the alternative. Well, it says primarily serves. Isn't that the phrase? Primarily serves the needs of other people. So, I mean, the argument on the side is, look, we've decided this is a critical link to serve the community, regardless of actual usage. This is what we need for public service. Why isn't that a permissible alternative interpretation of the phrase, as opposed to how many bicyclists, how many cars? As I said, the league's not disagreeing that there could be – there's a public need or service to go from Lake Village Drive on a bike or walking down to LPF 4. You just don't need two prongs. You only need one of this driveway. You know, the feasibility issue makes no sense because the alternative, which was clearly raised in the record, in fact, specified the western prong of the driveway. And even if you used all 22 feet of it, it's clearly feasible because it's what they're proposing to build. I was actually talking about the primarily serves rather than the feasibility. And all the league is saying is, yes, there should be connectivity from Lake Village down to LPF 4. We did not challenge the other LPFs. We're just not trying to prevent some bicyclists who would want to get from Lake Village down there to get there. You just only need one prong or you can extend it straight up. And the TRPA hasn't looked at either of these alternatives. It's simply not there. It's the duty of TRPA to put together substantial evidence to look at reasonable alternatives that the public in particular has proposed and to make some findings, to gather the evidence. Couldn't they say, but that's not a feasible alternative because it's not economic. It's not going to happen? They didn't say that in the record. There's no consideration of these two alternatives. I suppose they did. I suppose they said, so as we sent it back and now they had another hearing and said what basically they said here, which is this, there needs to be a road to get in there. And the developer is not going to, can't economically do both of them and isn't going to do both of them. And particularly if you end up not counting the road, then they're going to have to do something else. They're probably maybe not going to build the whole thing altogether. So, therefore, it's not feasible because it's not going to happen. But then you've slipped into a world where the LPF is primarily serving the needs of the developer because it's giving them a bigger project to do these other things. Well, perhaps. But, I mean, that may be a permissible finding that they can make. If it turns out, I would concede in terms of the direct path alternative, which the league is not an engineer. But if they were to consider that and it turns out, and mind you, if they did that, the project would get smaller. Probably some buildings would have to come out. You could put the path where there's a building now, they won't be able to put all those buildings in. So they could actually just put it where they're building a building. It's obviously feasible to build something there. But, yes, they could, if they were to consider that alternative, TRPA would have the first go at seeing whether there's evidence that would deem it infeasible to construct. And would infeasible include the project's not going to go forward if this happens and we're not going to get any bicycle path? That's not my read of it. I don't think the LPF's designed to, you know, allow for any project no matter what. They're about, they're focused just on the LPFs themselves. I don't think you can use the LPF exceptions to allow a larger project, even one that you perceive additional benefits coming from. Well, let's say the gated community argument would say, look, if we don't do this, then the public won't have any access at all. Why can't TRPA take that into consideration? Excuse me. The argument is that the alternative is that you end up with a series of gated communities in which there's no public access at all unless you make some sort of a deal with the developers. Isn't that something that's permissible for TRPA to take into consideration in terms of assessing whether it serves the public need? I think they could look at, you know, whether this is what they did do in terms of looking at whether there's connectivity. Again, the league's not arguing that there shouldn't be some connectivity here. The question is whether it's the minimum necessary to serve those purposes. So, you know, the notion that you would have to pick or treat the entire private driveway as an LPF in order to get other needs not served by the LPF, such as moderate income housing or any of those things, the access issues simply don't rise to that level. You know, people can get on a bike and they can walk and they do not need 22 feet and two entrances. But if it boils down to they need the bigger, they need to not include the driveway in the coverage for their project so that it's outside of the restrictions so that they can build a bigger project, because like some of the other benefits, then clearly that primary need then is. Oh, no, not some of the other benefits. Suppose it was that the only way that we're going to get a bike connective back path. Right. Because of the economics of it. Or if it's this one, that if we start saying, all right, build a smaller, only count the smaller part of it so the rest of it goes into your coverage and then the project then says, well, we can't do that because then we're not going to be able to build this project the way we've designed it. Then we can only build 40 houses and that's not economical for us to buy. We're leaving. I think that's primarily serving the developer, not the needs of the LPF, which is to get cyclists and pedestrians from Lake Village Drive down to LPF 4. So now you're not going to have that public benefit. Well, it's a private property, so, you know, I suppose they might not have proposed Why isn't that an economically infeasible project? It's not about whether the project's infeasible. Not the project. Why doesn't your proposal become economically infeasible because the conditions that made it possible to build it are no longer going to exist? I don't think that's what the findings are about in terms of an LPF, whether it's feasible, a feasible alternative to the LPF that would allow you to There's a list of factors. One of them is economic. Right. And if there's a viable showing that we just can't do this this way. Right. I think what it still boils down to, and it's kind of abstract for me because that's not what happened. There were two alternatives clearly proposed. Well, they were proposed. I'm not sure how clearly they were proposed. I mean, it's in the record. I grant you, I think, that they were raised, but certainly it's been flushed out in far more detail on appeal than it was, I think, in the presentation. Right. I do agree that certainly counsel for the agencies and for Sierra Colina have tried to come up with numbers that aren't in the record and trying to do some traffic or some kind of analysis on their own. I was just responding to your statement. It was clearly presented alternatives. They were presented. I'm not sure that they certainly weren't presented in as much detail as we have. I appreciate that. All I was saying is, though, that they were presented, they weren't considered the duties on TRPA to analyze the feasibility of an alternative and we think the minimum here is that there were two alternatives that were reasonable. One of them is plainly feasible because it's exactly the same prong as they're proposing. The other one, you know, it's up to TRPA to analyze those alternatives and they have to make a finding that there are no feasible alternatives that would reduce the coverage. So the two alternatives you're talking about are build a separate bike path connection and count only a part of this. But it's not, you don't have a third alternative, which is count 8 feet of this all the way through, but not 20 feet. Is that a third alternative? I don't think so. I mean, that would be the thing you could maybe infer from the comments that were made by the league. But I think the two clear ones that were made is you don't need both prongs. The west connector is all you need is how it was put by the executive director. That's the short prong. And there you have it. It could be just 8 feet total, 4 feet on each side. All right. We're way over time, but I have a question, which is what is the current status of this project? I'm probably not the best person to respond to that, but my understanding is it has not yet begun constructing and it's maybe we're at about a year away, and I would defer to Ms. Thomas for any details. Why don't you go ahead and respond? Thank you, Your Honors. Thank you. Given the other permits that are required and the, you know, just the today's economy, it's probably a couple years out before there will be any construction, can I just address those two prongs, those two alternatives very, very quickly? I know that this is unorthodox, but I really do want to say that the prongs Do you want further rebuttal from them? Make that. I'm just going to say that that western prong argument does not comply with any of these safety requirements in either the Lake Tahoe bike plan or the AASHTO plan. It just wouldn't. And then as to the power line alternative, there's no feasibility there. There's no discussion of feasibility. So I just wanted to say those two things. I think you made those points earlier, so I don't think we need a response. Thank you all for your arguments. Interesting case, and we'll take it under submission. We'll be in recess for the morning.
judges: Alarcon, Thomas, Berzon